*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JACQUELINE DAVIS,

        Plaintiff-Appellant,

v

BetMGM, LLC,

        Defendant-Appellee.

FOR PUBLICATION
September 28, 2023
9:00 a.m.

No. 363116
Wayne Circuit Court
LC No. 21-006981-CK

Before: BOONSTRA, P.J., and LETICA and FEENEY, JJ.

BOONSTRA, P.J.

Plaintiff appeals by right the circuit court's order granting summary disposition in favor of defendant. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant is a Delaware corporation, licensed to conduct business in Michigan, that operates an online gaming website. In March 2021, plaintiff won a significant amount of money playing defendant's "Luck O' the Roulette" game. On March 23, 2021, plaintiff withdrew $100,000 of her winnings from the withdrawal window at the MGM Grand Casino in Detroit. Shortly thereafter, her account was flagged by defendant for unusual activity and suspended, leaving plaintiff unable to play or access the remaining balance of her online account—approximately $3.2 million. After conducting an investigation, defendant determined that plaintiff's account had been erroneously credited due to an error in the game, and it "zeroed out" plaintiff's account.

Plaintiff contacted defendant through her attorney in April 2021, requesting that the funds be released. Defendant responded that plaintiff's account balance had been the result of an error, that plaintiff had not actually won that amount, and that she was not entitled to the remaining balance of her account.

Plaintiff filed suit in June 2021, alleging claims of fraud, conversion, and breach of contract against defendant. Plaintiff claimed that defendant had fraudulently misrepresented that its game was functioning properly and that defendant would pay the amounts won by its players, that

-1-

defendant had wrongfully converted the funds in her account, and that defendant had violated its user agreement with plaintiff.

In July 2021, after filing suit in the circuit court, plaintiff filed a patron dispute with the Michigan Gaming Control Board (MGCB). Later in July, defendant filed a motion for summary disposition under MCR 2.116(C)(4), arguing that plaintiff's claims were preempted by the Lawful Internet Gaming Act (LIGA), MCL 432.301 *et seq*., that the MGCB had primary jurisdiction over plaintiff's claims, and that plaintiff had failed to exhaust her administrative remedies.

In February 2022, the deputy director of the MGCB informed plaintiff via letter that the MGCB had completed its investigation and was considering what actions to take. The letter stated, in pertinent part:

> As noted in our January 24, 2022 email to your attorney, the patron complaint process exists to inform the Board of potential violations of the Lawful Internet Gaming Act and Rules by its licensees. MGCB investigations are not intended to determine the merits of any outstanding dispute or litigation between an authorized participant and the internet gaming operator and its internet gaming platform provider. Rather, the MGCB's powers include supervising internet gaming operations, investigating alleged violations of the Act and Rules, and upon the finding of a violation of the Act or Rules, the Board may direct a licensee to take any corrective action the board considers appropriate.

> Based on the information that you provided, and after a thorough investigation into the allegations in your complaint, MGCB will determine whether there was a violation by [defendant] of the Act and Rules. And if so, the appropriate remedy for such violation based on the Act and Michigan's Administrative Procedures Act, MCL 24.201 *et seq*. If [defendant] is found responsible for a violation, that information would be made public after it is fully adjudicated.

The circuit court heard oral arguments on defendant's motion on May 5, 2022. Plaintiff argued that defendant had fraudulently violated several administrative rules promulgated by the MGCB. Plaintiff referred to the letter from the MGCB deputy director, and argued that the letter indicated that the MGCB lacked jurisdiction over her claims.

In June 2022, the circuit court issued an opinion and order granting defendant's motion on the ground that LIGA preempted plaintiff's claims. Plaintiff subsequently moved for reconsideration. Plaintiff's motion was accompanied by a partially-redacted letter from the MGCB to defendant's Chief Executive Officer, which had been produced in response to a Freedom of Information Act (FOIA), MCL 15.231 *et seq*., request. The letter indicated that defendant had failed to comply with the MGCB's rules requiring defendant to immediately notify the MGCB of a malfunctioning game, to advise plaintiff of her right to submit a complaint to the MGCB, and to timely provide specific information to the MGCB when requested. The letter concluded that "The Board has decided not to pursue formal disciplinary action at this time. Please be advised that any further violation of the Lawful Internet Gaming Act or Michigan Internet Gaming Rules may result in formal disciplinary action."

The circuit court denied the reconsideration motion. This appeal followed.

## II. STANDARD OF REVIEW

We review de novo whether a court has subject-matter jurisdiction. *Calabrese v Tendercare of Mich, Inc*, 262 Mich App 256, 259; 685 NW2d 313 (2004). We review de novo a circuit court's decision on a motion for summary disposition. *Kraft v Detroit Entertainment, LLC*, 261 Mich App 534, 540; 683 NW2d 200 (2004). We also review de novo issues of statutory interpretation. *Id.* We review for an abuse of discretion a circuit court's decision to deny reconsideration. *Woods v SLB Prop Mgmt, LLC*, 277 Mich App 622, 629; 750NW2d 228 (2008).

## III. ANALYSIS

Plaintiff argues that the circuit court erred by determining that her claims were preempted by LIGA, and by accordingly granting defendant's motion for summary disposition based on lack of subject-matter jurisdiction. We disagree.

A state statute may preempt common-law claims by providing an exclusive statutory remedy. *Kraft*, 261 Mich App 534, 544; 683 NW2d 200 (2004). "In general, where comprehensive legislation prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions, the Legislature will be found to have intended that the statute supersede and replace the common law dealing with the subject matter." *Id.* at 545 (citations omitted). Therefore, we must examine the relevant language of LIGA in order to determine whether the Legislature intended that LIGA provide the exclusive remedy for plaintiff's claims for fraud, conversion, and breach of contract in this case. *Id.*; see also *Papas v Gaming Control Bd*, 257 Mich App 647, 658; 669 NW2d 326 (2003).

In interpreting statutory language, we seek to give effect to the intent of the Legislature. *Papas*, 257 Mich at 647. To determine the Legislature's intent, we begin with the language of the statute itself and presume that the Legislature's intended meaning was as plainly expressed by the unambiguous language of the statute. *Id.* Only if statutory language is ambiguous may we go beyond the words of the statute to determine the Legislature's intent. *Id.* Statutes that relate to the same subject or share a common purpose should, if possible, be interpreted harmoniously. *Bloomfield Twp v Kane*, 302 Mich App 170, 176-177; 839 NW2d 505 (2013).

LIGA provides that the purpose of the act is to "protect residents of this state who wager on games of chance or skill through the internet and to capture revenues generated from internet gaming" through regulation "by establishing a secure, responsible, fair, and legal system of internet gaming." MCL 432.302(d). LIGA defines an "internet game" in relevant part as "a game of skill or chance that is offered for play through the internet in which an individual wagers money or something of monetary value for the opportunity to win money or something of monetary value." MCL 432.303(q). LIGA provides that "internet gaming may be conducted only to the extent that it is conducted in accordance with this act." MCL 432.304(1). Moreover, "[a] law that is inconsistent with this act does not apply to internet gaming as provided for by this act." MCL 432.304(3).

LIGA states that the MGCB "has the powers and duties specified in this act and all other powers necessary to enable it to fully and effectively execute this act to administer, regulate, and

enforce the system of internet gaming established under this act." MCL 432.305(1). The MGCB "has jurisdiction over every person licensed by the board and may take enforcement action against a person that is not licensed by the board that offers internet gaming in this state." MCL 432.305(2). MCL 432.309 grants the MGCB jurisdiction and supervisory authority over internet gaming operations in Michigan, and provides:

(1) The board has jurisdiction over and shall supervise all internet gaming operations governed by this act. The board may do anything necessary or desirable to effectuate this act, including, but not limited to, all of the following:

(a) Develop qualifications, standards, and procedures for approval and licensure by the board of internet gaming operators and internet gaming suppliers.

(b) Decide promptly and in reasonable order all license applications and approve, deny, suspend, revoke, restrict, or refuse to renew internet gaming operator licenses and internet gaming supplier licenses. A party aggrieved by an action of the board denying, suspending, revoking, restricting, or refusing to renew a license may request a contested case hearing before the board under the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328. A request for hearing under this subdivision must be made to the board in writing within 21 days after service of notice of the action by the board.

(c) Conduct all hearings pertaining to violations of this act or rules promulgated under this act.

(d) Provide for the establishment and collection of all applicable license fees, taxes, and payments imposed by this act and the rules promulgated under this act and the deposit of the applicable fees, taxes, and payments into the fund.

(e) Develop and enforce testing and auditing requirements for internet gaming platforms, internet wagering, and internet wagering accounts.

(f) Develop and enforce requirements for responsible gaming and player protection, including privacy and confidentiality standards and duties.

(g) Develop and enforce requirements for accepting internet wagers.

(h) Adopt by rule a code of conduct governing board employees that ensures, to the maximum extent possible, that persons subject to this act avoid situations, relationships, or associations that may represent or lead to an actual or perceived conflict of interest.

(i) Develop and administer civil fines for internet gaming operators and internet gaming suppliers that violate this act or the rules promulgated under this act.

(j) Audit and inspect books and records relevant to internet gaming operations, internet wagers, internet wagering accounts, internet games, or internet gaming platforms, including, but not limited to, the books and records regarding financing

and accounting materials held by or in the custody of an internet gaming operator or internet gaming supplier.

(k) Acquire by lease or by purchase personal property, including, but not limited to, any of the following:

(i) Computer hardware.

(ii) Mechanical, electronic, and online equipment and terminals.

(iii) Intangible property, including, but not limited to, computer programs, software, and systems.

(2) The board may investigate and may issue cease and desist orders and obtain injunctive relief against a person that is not licensed by the board that offers internet gaming in this state.

(3) The board shall keep all information, records, interviews, reports, statements, memoranda, and other data supplied to or used by the board in the course of any investigation of a person licensed under this act confidential. The materials described in this subsection are exempt from disclosure under section 13 of the freedom of information act, 1976 PA 442, MCL 15.243.

The MGCB is also empowered to promulgate administrative rules as "necessary and proper to govern internet gaming," including "[r]equirements to ensure responsible gaming" and "[t]echnical and financial standards for internet wagering, internet wagering accounts, and internet gaming platforms, systems, and software or other electronic components integral to offering internet gaming." MCL 432.310(c), (d). LIGA also contains criminal penalties for, among other things, operation of an unlicensed internet gaming operation, providing false statements to MGCB, and

Knowingly, with the intent to cheat, alter, tamper with, or manipulate any game, platform, equipment, software, hardware, devices, or supplies used to conduct internet gaming, in order to alter the odds or the payout, or to disable the game, platform, equipment, software, hardware, devices, or supplies from operating in the manner authorized by the board, or knowingly, with the intent to cheat, offer or allow to be offered any game, platform, equipment, software, hardware, devices, or supplies that have been altered, tampered with, or manipulated in such a manner. [MCL 432.313(a), (b), (c), (e).]

The MGCB has in fact promulgated numerous rules as authorized by LIGA, including requiring internet gaming platforms and games to be approved by the MGCB, requiring any changes or modifications to those games to be approved by the MGCB, requiring all "terms and conditions" agreements issued by internet gaming providers to contain MGCB-approved terms, and authorizing the MGCB to "investigate any claim that an operator, platform provider or supplier has violated any provision of the Act or the Rules and impose penalties, fines, and/or other discipline." Mich Admin Code, R 432.632a, 432.637a, 432.652, R 432.613.

As the parties have noted, there is a dearth of caselaw interpreting LIGA, which was enacted in 2019. However, cases interpreting the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 *et seq*., are instructive. In *Kraft*, this Court concluded that MGCRA was intended to preclude inconsistent common-law actions based on the provision that stated "[a]ny other law that is inconsistent with this act does not apply to casino gaming as provided for by this act." *Kraft*, 261 Mich App at 546. The same conclusion is warranted here in light of the LIGA's corresponding provision that "[a] law that is inconsistent with this act does not apply to internet gaming as provided for this act." MCL 432.304(3). Although plaintiff argues that the Legislature's use of the word "other" in MGCRA (and not in LIGA) indicates that it intended MGCRA to sweep more broadly, we see no functional difference between the two phrases—the phrase "any other" and the indefinite article "a" both imply a broad generality. See *Robinson v Lansing*, 486 Mich 1, 14; 782 NW2d 171 (2010); *People v Hesch*, 278 Mich App 188, 195; 749 NW2d 267 (2008). Not every variation in the language used by the Legislature requires a different interpretation. See *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 184 n 10; 931 NW2d 539 (2019) ) ("[T]he maxim that a difference in language signifies a difference in meaning is a *general* rule; it may not apply in every situation."). We therefore hold that the Legislature intended that LIGA preempt inconsistent common-law claims.

The question then becomes whether plaintiff's common-law claims for fraud, conversion, and breach of contract are inconsistent with LIGA. We conclude that they are. LIGA, like MGCRA, is "comprehensive legislation" that "prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions." *Kraft*, 261 Mich App at 545. In *Kraft*, this Court noted the "expansive and exclusive authority" of the MGCB to "regulate all aspects of casino gambling in Michigan" under MGCRA. *Id*. at 249. This Court elaborated:

> The MGCB has the duty to, among other things, review casino license applications, promulgate rules and regulations to implement and enforce the act, provide for the levy and collection of penalties and fines for violation of the act or administrative rules, and receive complaints from the public and conduct investigations into the conduct of gambling operations to assure compliance with the act and to protect the integrity of casino gaming. MCL 432.204(17). Licensees are obligated to obtain the MGCB's approval of the rules of the game in question, and the MGCB may only approve a game if the rules of the game "ensure that the game will be played with integrity," and the rules fulfill "[o]ther requirements necessary to protect the public and ensure public confidence in gaming." 1999 AC, R 432.1806(3)(d). With respect to gaming equipment, which includes electronic gaming devices such as slot machines, if the MGCB determines that the equipment is "not adequate to ensure compliance with the act and these rules or the integrity of the game," the board may order the casino licensee's compliance. 1999 AC, R 432.1810(2). The MGCB rules also set forth the procedure for a patron to file a complaint against a casino licensee. 1999 AC, R 432.11501-432.11503. The MGCB may revoke casino licenses and impose fines for fraudulent conduct. MCL 432.204a(1)(m). In furtherance of protecting the public and ensuring public confidence in gaming, the MGCB has the power and duty to prevent manufacturers from producing, and casinos from using, casino games that are deceitful or misleading to casino patrons. Once the MGCB has inspected and approved a casino game, the manufacturers and

casinos should be able to rely on the MGCB's determination that the game was appropriate for the gaming public.

Because the MGCB monitors casino games to ensure integrity and, thus, to prevent fraud and deceit, we conclude that plaintiff's common-law claims are inconsistent with the MGCRA under MCL 432.203(3) and are thus inapplicable against defendants. [*Id*. at 550-551 (footnote omitted).]

Plaintiff's claims in this case, like those in *Kraft*, were based in part on defendant's alleged "fraud and deceit." Specifically, plaintiff alleged that defendant failed to notice that its game was malfunctioning, failed to notify the MGCB of the error in a timely fashion, and continued to operate its game in a manner that fraudulently misrepresented that it was a functioning game in compliance with Michigan internet gaming laws. Plaintiff also alleged that defendant refused to pay the funds that were present in her online account as the result of her play of the fraudulent game; plaintiff alleged that defendant informed her that it had flagged her account, investigated it, and adjusted the amount contained within it.[1] Plaintiff also alleged that defendant violated the user agreement by failing to pay her the balance of her account.

A portion of plaintiff's claims appear to be explicitly based on defendant's alleged violation of LIGA or rules promulgated under it; the remainder of plaintiff's claims nonetheless conflict with the MGCB's authority under LIGA to regulate all aspects of internet gaming. Although plaintiff argues that the letter she received from the MGCB indicated that the MGCB lacked the authority to resolve her dispute, it is clear that the MGCB had the power under LIGA to investigate disputes such as plaintiff's, to determine whether a violation of LIGA or the rules promulgated under it had occurred, and to require corrective actions from an internet gaming provider. See MCL 432.309(1); Mich Admin Code R 432.613. The fact that the MGCB did not or will not take action in plaintiff's favor in this particular case does not alter our preemption analysis.

If a statute vests the MGCB or other administrative agency with exclusive jurisdiction over a matter, the circuit court lacks subject-matter jurisdiction. See *Papas*, 257 Mich App at 666. The circuit court therefore correctly granted defendant's motion for summary disposition. *Doe v Gen Motors, LLC*, ___ Mich ___; 992 NW2d 275, 276 (2023) ("Summary disposition under

---

[1] We note that this case differs from *Dep't of Agriculture v Appletree Marketing, LLC*, 485 Mich 1; 779 NW2d 237 (2010). In *Appletree Marketing*, our Supreme Court found that the Agricultural Commodities Marketing Act (ACMA) did not bar the plaintiff's claims for conversion. *Id*. at 13, 17. However, in that case the Court gave a great deal of weight to language in the ACMA explicitly stating that the remedies it provided were "in addition to any other remedy provided by law." *Id*. at 8-9. Additionally, the defendant in *Appletree Marketing* had undisputedly agreed to hold certain funds in trust for the plaintiff, and had refused to release them, instead using those funds to pay other debts owed by the company; the Court concluded that the defendant had violated an "independent fiduciary duty not to convert the trust funds they held." *Id*. at 13. In this case, no such statutory language appears. Additionally, the issue in this case involves, essentially, whether the $3.2 million dollars in gambling winnings claimed by plaintiff were actually owed to her, not whether defendant had converted funds that were entrusted to it as a fiduciary.

MCR 2.116(C)(4) is appropriate when '[t]he court lacks jurisdiction of the subject matter.' "), quoting MCR 2.116(C)(4).[2]

Affirmed.[3]

/s/ Mark T. Boonstra
/s/ Anica Letica

---

[2] Relatedly, plaintiff argues that the circuit court erred by denying her motion for reconsideration, in light of the letter she had obtained via a FOIA request. We disagree. The letter itself does not indicate that it was a final decision of the MGCB that resolved plaintiff's patron dispute, and only addressed some specific rules violations related to defendant's duty to respond to MGCB requests and inform plaintiff of her rights to bring a dispute to the Board. Unlike MCRA, *Papas*, 257 Mich App at 666 n 5; MCL 432.217, LIGA does not contain a provision explicitly providing that a final decision of the MGCB is subject to judicial review. But even assuming that the ultimate resolution of a patron dispute was subject to review, plaintiff did not establish in her motion for reconsideration that the partially-redacted letter to defendant from the MGCB constituted a final decision of the MGCB. The circuit court did not abuse its discretion by denying reconsideration. *Woods*, 277 Mich App at 629.

[3] We respectfully disagree with our dissenting colleague's characterization of our decision as leaving plaintiff without a forum. More accurately, plaintiff is, perhaps understandably, dissatisfied that the MGCB declined to afford her a more satisfactory remedy. And regardless of how the MGCB may have characterized its role in emails or letters, the fact remains that the MGCB does not determine its jurisdiction or that of the circuit court. Moreover, as noted, the MGCB's administrative rules authorize patrons to file complaints, in which case the MGCB has the authority to investigate and "impose penalties, fines, and/or other discipline," Mich Admin Code, R 432.632a, 432.637a, 432.652, R 432.613. If it deemed it appropriate, therefore, the MGCB seemingly could have ordered, for example, the reactivation of plaintiff's account to allow her to withdraw the funds in dispute. That it may have declined to do so does not, however, leave plaintiff without a forum. Nor would our decision preclude a patron such as plaintiff from pursuing an action seeking judicial review of a final decision of the MGCB, see MCL 24.301, or mandamus or other relief, if appropriate. Finally, our decision is based on statutory interpretation, the preemption doctrine, and the application of this Court's precedents, none of which is impacted, in our judgment, by the factual distinctions drawn by the dissent.